## PEARCE KEATON V. THE STATE.

### No. 1938. Decided April 11, 1900.

**1. Continuance—Agreement of Counsel.**

The court is not required to grant a continuance merely because there is an agreement of the parties that the case should be continued, and a refusal on the part of the court to continue upon such agreement will not be ground for reversal unless there is some legal reason shown whereby injustice was done defendant.

**2. Terms of Court.**

Where during a regular legal session of court the Legislature amended, with an emergency clause, the act which fixed the terms of said court by adding another week to the term without changing the beginning of the term, Held, this did not repeal the previous law under which the court was being held.

**3. Juror and Jury Law—Challenges.**

Reversible error is not shown in the impanelment of the jury where no objectionable juror was forced upon defendant after he had exhausted his peremptory challenges.

**4. Murder—Evidence—Sufferings of Deceased.**

On a trial for murder it is competent to prove the mental or physical condition or both of deceased immediately after he was shot; that he was groaning and seemed to be in a great deal of pain, and said he was suffering very much.

**5. Dying Declarations—Consciousness of Approaching Death.**

Between 9 and 10 o'clock on the morning of the day deceased died, when told that he was to be operated upon by physicians and that hope was expressed that he would soon be better, he replied, "No, I'll never be any better; I am a done man." He died that night a few minutes before 10 o'clock, being rational a few minutes before his death. About three hours before his death he stated he wasn't any better, and then made a statement to the witnesses as to how he was shot. Held, this sufficiently shows he was conscious of approaching death, and was sufficient as a predicate to admit his statements as dying declarations.

**6. Defendant as a Witness—Impeachment.**

A defendant who is a witness in his own behalf may be impeached as to his credibility by proving by him that he has been in the penitentiary, and it is not necessary that the record of his conviction should be introduced to prove the facts, but he may be forced to answer as to the matter on cross-examination.

**7. Two Distinct Offenses in the Same Transaction.**

The fact that defendant has been convicted of an assault with intent to rob one person is no bar to his prosecution and conviction for the murder of another person, where the offenses are distinct offenses, although perpetrated in the same transaction.

**8. Murder—Forcing Deceased to Occupy the Place of Danger—Charge.**

On a trial for murder in the perpetration of a train-robbery, where it appeared that defendant and his confederates took deceased to the place where he was shot and which they knew was a place of danger where he might probably lose his life, Held, defendant was liable for deceased's murder at said place, no matter by whom he was shot, in the shooting which occurred between the robbers and the train passengers, and the court did not err in so instructing the jury.

APPEAL from the District Court of Coleman. Tried below before Hon. J. O. WOODWARD.

Appeal from a conviction of murder in the first degree; penalty, imprisonment for life in the penitentiary.

This is a companion case to Jeff Taylor v. State, *ante,* p. 564.

The indictment charged appellant with the murder of Lee Johnson on June 9, 1898, by shooting him with a gun and pistol. The murder was committed in the attempted perpetration of a train robbery. The

attempted robbery occurred about 10 o'clock at night at the north end of the switch or Y at Coleman Junction. The train was facing south with the pilot of the engine near the switch. On the east side of the track near this pilot there was a circular embankment extending out some ten or twelve feet from the track upon which the switch block flag was located. The brakeman went forward when the train stopped to throw the switch to let the train in on the Ballinger end of the Y. The robbers opened up a fusilade of shots and the brakeman rushed back into the cars, exclaiming, "The robbers have got us!" In the meantime, Engineer Stanton testifies: "Myself and Lee Johnson (deceased fireman) were forced out of the cab at the point of pistols, and after being forced out Johnson was compelled by one of the robbers to go to the express car door, and two of them looked after me. When Johnson came back to the cab and shut off the injector, he was again marched back to near the express car door by one of the robbers. He was compelled to go and remain there by robbers." After being taken out of the cab, same witness says: "One of the robbers took Johnson forward to the express car, and Johnson told the messenger that they wanted him to open up. I heard them cursing and asking if the messenger had opened the car and threatening to blow up the car with dynamite. I was beside the tender at the time another man ran up and placed his face close to mine and said: 'Is that you, Bill?' I said 'No.' He said, 'What are you trying to get under there for?' I was rather under the side of the tender. I said, 'I am afraid of being shot.' He said, 'We are not going to hurt you.' I said, 'I am not afraid of you shooting me; I am afraid of being shot from the rear end of the train.' At this time I heard the fireman say that he would have to shut off the injector. There were two men with me at this time. One of them said, 'Has he left the damn thing so it will blow up?' I said, 'Not for a minute; that is all right.' About this time Johnson and the robber with him came back. Johnson then said, 'Mr. Stanton, I will have to shut off that injector.' I said, 'Never mind,' and then told Johnson to shut it off. He went back and shut off the injector." He was then marched back to the front of the express car, when more threats were made by the robbers to blow up the express car with dynamite. The engineer, Stanton, and two robbers with him were near the tender to engine, about middle of tender. Stanton says: "I was in next to tender; of course I was getting in as close to it as I could so as to be out of range of any shooting from toward rear of train, and when in there next to tender I could not see toward rear of train; the front end of express car would shut off my view." It projected out some eighteen inches more than tender. In the meantime the brakeman's outcry had awakened R. E. Buchanan, who opened his grip, secured his pistol and went out of the rear end of the smoking car between the chair car and smoker, and stepped down on the lower steps of the smoker. By this time the robbers were again at the express car door with Johnson in charge. Buchanan took a view of the situation so as to place the parties, and fired two shots in quick

succession at the robbers from the steps, and then swung down off the steps to the ground by the side of the car in the shadow and emptied his pistol at the robbers. Buchanan was to the north of the robbers, also on east side of train. When Buchanan shot, the robbers immediately returned the fire with a number of shots, and in the shooting Lee Johnson was killed, by either the robbers or by Buchanan. All the testimony, with the exception of the opinion of three physicians, showed that the fireman was shot by the robbers. The opinion of the physicians was divided as usual, three stating in their opinion the ball entered from the right side, and three that it entered from the left side. The wound on the right side was considerably larger than left; some of the witnesses say twice as large in right as left. The wound on left was to the front of body near navel, and in right to rear lower down and just over the hip, the range the ball would have taken if shot by the robber that witness Cox saw shooting from the dump near the pilot and the party whom deceased said shot him. Appellant, Pearce Keaton, testified: "Newman and the fireman were by this time at the express car door and the fireman was telling the express messenger to open up. The engineer was crouched down under the tender and I thought was trying to crawl under the car and run away. It was part of our plan to cut the express car loose and run it off from train, and for this reason we did not want the engineer and fireman to get away from us. But the brakeman running back to the car frustrated our plans; we did not expect the brakeman to be out there. I said to the engineer, 'What are you trying to get under there for?' and he said, 'I am afraid of being shot;' I said, 'We are not going to hurt you and we don't want any workingman's money; it is the express that we are after.' He said, 'I am not afraid of your shooting me, but I am afraid of being shot from other end of the train.' At this time Newman and the fireman came back, and the fireman said he was going to shut off something about the engine. * * * When he had shut it off, Newman and the fireman went back to the express car and the fireman told the express messenger to open up. Newman cursed them and said, 'Bring on that dynamite and we'll blow the damn thing up.' About this time some one began shooting from the train."

On cross-examination Pearce Keaton, defendant, testified: "Myself, Bud Newman, Jeff Taylor, and Bill Taylor entered into an agreement to rob the express on the Gulf, Colorado & Santa Fe train at Coleman Junction. We first spoke of robbing it at Ballinger, but the Taylors said Coleman Junction would be the best place. They were acquainted with the place, so they said. We first talked about it about two months before we made the attempt. We agreed to come to Coleman Junction for the purpose, and did come for that purpose. We did not agree before we started up there as to the part each one was to perform. We made the agreement while we were on the road up there as to the part each was to perform. Bill Taylor was to be the leader and direct. It was agreed that myself and Bud Newman were

to take the engineer and fireman in charge and take them out of the cab, and that Newman was to take one of them with him to the express car for the purpose of getting the express car opened. When we got there myself and Newman got on the engine and made the engineer and fireman get out of the cab and on the ground. We used our guns in doing so. Myself and Jeff Taylor, after they got out of the cab, took charge of the engineer; and Newman took charge of the fireman and marched him up to the express car door to have it opened. We forced the fireman and engineer to do as we told them, and while Newman and the fireman were at the express car the first time, something got the matter with the engine, and the fireman said to Newman, 'I will have to shut off that injector,' and he and Newman then came back for that purpose. At the time they (Newman and the fireman) were at the express car and before they came back, myself, Jeff Taylor, and the engineer were near the tender to the engine and the engineer was trying to get down under the car, and I asked him what he was trying to get under there for, and the engineer said, 'I am afraid of being shot,' and I told him, 'We are not going to hurt you; we don't want to hurt any laboring man or take any laboring man's money.' The engineer said, 'I am not afraid of your shooting me; I am afraid of being shot from the other end of the train.' After the fireman so stated to me, and notwithstanding I was informed there was danger of the fireman and engineer being shot from the rear end of the train, the fireman after shutting off the injector was forced back to the express car in front of Newman and to remain there, and he was shot while he was being so held up there at the express car. I did not myself force him to go there. Newman did so with arms. I was backing up and assisting Newman when he took the fireman there, and we took the fireman there for the purpose of accomplishing the robbery. * * * There was nothing said in our agreement to rob about what we would do in case of resistance. We all had guns and pistols. We had no agreement particularly to that effect, but we did not intend in case of resistance to get any the worst of it if we could help it."

*Jenkins & McCartney,* for appellant, filed an able brief and argument on the motion for rehearing, which owing to length can not be reproduced in full. Then principal contentions are shown by the propositions summarized in the argument on the motion for rehearing, as follows:

1. A death in order to amount to a homicide, must result from a physical force.

2. The physical force which destroys the life must be the act, actually or constructively, of the accused.

3. By "actually" is meant that the physical force which caused the death must have been projected in whole or in part by his own physical power; that is to say, he must by his own physical power, or by his own physical power aided by others, have struck the blow or done the act which killed the deceased.

4. By "constructively" is meant that his own will, either alone or connected with others acting with him, must have impelled or set in motion the physical force which killed the deceased.

5. Where the immediate and sole cause of death is the act of an independent human will, not acting in concert with the accused, the act is neither actually or constructively the act of the accused.

6. Where the immediate cause of death results from the act of a third party done at the instance of the accused, and such third party has no will or discretion because of infancy, idiocy, or fear, or if by reason of blindness or deafness or other defect of the senses he does not know what he is doing, then such act is the act of accused done by him through the intervening party as a mere passive, or, as it were, a mechanical agency.

7. That when the accused places the deceased in a place of danger and he is killed by an intelligent third party who acts in the premises in the usual and expected manner of his business only, with no knowledge of the position of deceased, then such killing is the act of the accused, acting through an unconscious and, so far as that transaction is concerned, an unintelligent agency.

Applying these principles to the facts in this case, we have: (1) The physical force that killed Johnson was a bullet fired by Buchanan. (2) The shot fired by Buchanan was not actually or constructively fired by appellant. (3) Not actually by appellant, because not in whole or in part by his hand. (4) Not constructively by appellant. because not by one acting with him. (5) Neither actually nor constructively, because Buchanan was not acting with but against the appellant. (6) Buchanan, the intervening party, who did the act which was the immediate and sole cause of Johnson's death, was neither a child nor an idiot, neither deaf nor blind, and was not commanded by appellant to shoot and by threats forced to do so. (7) Buchanan did not kill Johnson in the discharge of his ordinary business in the usual and expected manner and in ignorance of Johnson's position.

There is nothing in our statute to change these well established principles of law, and nothing in the decisions of this State or elsewhere to cause them to be applied other than in the Campbell and Butler cases. Article 77 of our Penal Code is but a re-enactment of the common law. The expression, "or by the use of any other direct means causes another to receive an injury to his person or property," does not alter the meaning of the word cause, nor change the rule that to be guilty of homicide the death must result from the act of the accused. On the contrary it provides that the injury must result from "the use of such indirect means." Article 651, Penal Code, is common law without any alteration. Article 651 says: "Homicide is the destruction of life by the act, agency, procurement, or culpable omission of another." If by the act or culpable omission of the accused, it would be "actually" his act; if by his agency or procurement, it would

41st Crim. Rep.—40

be "constructively" his act. So we see this does not alter the common law in this regard.

*Sims & Snodgrass* and *Rob't A. John*, Assistant Attorney-General, for the State, filed an able and elaborate brief and argument.

BROOKS, JUDGE.—Appellant was convicted of the murder of Lee Johnson, and his punishment assessed at confinement in the penitentiary for life. Appellant testified in his own behalf substantially as follows: "Myself, Bud Newman, Jeff Taylor, and Bill Taylor entered into an agreement to rob the express on the Gulf, Colorado & Santa Fe Company's train at Coleman Junction. We first spoke of robbing it at Ballinger, but the Taylors said Coleman Junction would be the best place. They were acquainted with the place, so they said. We first talked about it about two months before we made the attempt. We agreed to come to Coleman Junction for the purpose, and did come for that purpose. We did not agree, before we started up there, as to the part each one was to perform. We made the agreement while we were on the road up there as to the part each was to perform. Bill Taylor was to be the leader, and direct. It was agreed that myself and Bud Newman were to take the engineer and fireman in charge, and take them out of the cab, and that Newman was to take one of them with him to the express car for the purpose of getting express car opened. When we got there myself and Newman got on the engine, and made the engineer and fireman get out of the cab, and on the ground. We used our guns in doing so. Myself and Jeff Taylor, after they got out of the cab, took charge of the engineer, and Newman took charge of the fireman, and marched him up to the express car door to have it opened. We forced the fireman and engineer to do as we told them, and while Newman and fireman were at express car first time something got the matter with the engine, and fireman said to Newman, 'I will have to shut off that injector,' and he and Newman then came back for that purpose. At time they [Newman and fireman] were at express car and before they came back myself, Jeff Taylor, and the engineer were near the tender to the engine, and engineer was trying to get down under the car; and I asked him what he was trying to get under there for, and engineer said, 'I am afraid of being shot,' and I told him, 'We are not going to hurt you. We don't want to hurt any laboring man, or take any laboring man's money.' The engineer said, 'I am not afraid of you shooting me. I am afraid of being shot from the other end of the train.' After the fireman so stated to me, and notwithstanding I was informed there was danger of fireman and engineer being shot from rear end of the train, the fireman, after shutting off injector, was forced to go back to express car in front of Newman, and to remain there, and he was shot while being so held up there at the express car. I did not myself force him to go there. Newman did so with arms. I was backing him up and assisting Newman when he took fireman there, and we took fireman there for th

purpose of accomplishing robbery. * * * There was nothing said in our agreement to rob about what we would do in case of resistance. We all had guns and pistols. We had no agreement particularly to that effect; but we did not intend, in case of resistance, to get any the worst of it, if we could help it."

Appellant's first assignment is that the court erred in overruling his application for continuance, after the district attorney and private prosecutor and defendant, by his attorneys, had orally agreed to continue the case until the September term of the court, which agreement was announced to the court; whereupon the court stated he would not allow said cause to be continued, but it must proceed at once. The court qualifies this bill as follows: "I did not believe attorneys for the State and defendant should be permitted to agree to continue a lot of murder cases, when I personally knew the case could be tried and disposed of. One of the defendants, to wit, Jeff Taylor, had just been brought from the penitentiary for trial on the charge of murder, and when I so stated that the case must be tried no motion was made to continue." We do not think the mere agreement of counsel to continue the cause requires the court to grant the continuance; and where a trial judge refuses to ratify such agreement and continue the case, unless some legal reason is shown whereby an injustice has been done appellant, it will not be cause for reversal.

Appellant's second assignment contends that the court, at the time this case was tried, was not lawfully in session, and had no jurisdiction at said time and place to try it, because the Legislature had, since the convening of the court, repealed the law fixing the time for holding terms of the District Court in Coleman County by passing an amendment fixing the times for holding said court in said county, which terminated the February term, 1899, of said court, and this court could not again lawfully be in session before the first Monday in September, 1899; and defendant excepted to the jurisdiction of this court to try this cause at said time. The court overruled the exception. The regular time for the convening of the term of court at which appellant was tried was the first Monday in February, 1899, to continue in session four weeks. The court was organized on said day. While the court was in session and being held under the then existing law, the Legislature passed an act, with the emergency clause attached, merely adding to the term of court for Coleman County one week. The amendment provided for the term to begin the first Monday in February and to remain in session five weeks. It will be seen from this that the beginning of the term was not changed, and that the clear intendment of the Legislature was simply to give one additional week to Coleman County for the District Court, and the amendment was not intended to have a retrospective effect, so as to repeal the then existing term of the District Court of Coleman County. Article 5, section 7, of the Constitution provides: "The State shall be divided into as many judicial districts as may now or hereafter be provided by law, which may be increased or diminished by law. He [the district judge] shall

hold the regular term of his court at the county seat of each county in his district at least twice each year, in such manner as may be prescribed by law." The bare statement of this constitutional provision would certainly preclude the construction of the amendment by the Legislature as contended for by appellant; his contention being that the amendment repealed the previous law whereby the session of the District Court of Coleman County was authorized to begin on the first Monday in February. If this is a repeal of the old law, then Coleman County would be deprived of one term of the District Court, which would be in the face of the constitutional provision quoted. We do not think the court erred in overruling appellant's plea to the jurisdiction.

Appellant's third assignment is that the court erred in refusing to set aside various jurors who stated on their voir dire that they had formed and had a clear, well-defined, and fixed opinion as to the guilty participancy of appellant in the attempt to rob the express at Coleman Junction, at the time the fireman was killed, and that it would require evidence to remove said opinion, but they had no opinion as to the guilt or innocence of defendant upon the charge of murder in this case. The trial court appends this explanation, to wit: "Each of the veniremen stated the opinion they had formed was exclusively from hearsay, rumor, and newspaper reports; that they had no bias in favor of or prejudice against defendant; that if taken on jury they would discard this opinion, and same would not have the slightest influence on them in returning a verdict; that they would base their verdict in the case on the evidence as given on the trial under the law; that they had no opinion whatever as to guilt or innocence of defendant of the charge now pending against him. R. M. Grantham stated that he had not heard what purported to be the facts; that he had no opinion as to guilt or innocence of defendant, either of the attempt to rob or the present charge. Said Grantham was the fifteenth juror challenged by defendant peremptorily, and stood aside. The juror J. B. Warren stated he had no opinion as to guilt or innocence of defendant on the present charge; that the opinion as to his participation in the attempt to rob was based solely upon hearsay, newspaper reports and rumor; that he would discard said opinion, and same would not have the slightest influence in arriving at a verdict; that he would base his verdict upon the evidence given on the trial and under the law. This juror was not challenged peremptorily, but was accepted by defendant. The twelfth juryman sworn in was A. A. Griggs, who stated on his voir dire that he had no bias in favor of or prejudice against defendant; that he had not formed such a conclusion as to the guilt or innocence of defendant as would influence his action in finding a verdict; that he had no opinion whatever as to guilt or innocence of defendant of either the charge of attempt to rob or the charge in this case; that he had not heard any witness speak of the case, and had not heard what purported to be the facts of the case, either as to charge of attempt to rob or present charge of murder; that he did not

have the opinion that, if Lee Johnson was killed in the attempt to rob, defendant was responsible for same, and ought to be punished; that he had no opinion in regard to that. Said juror was thereupon accepted by State. Defendant challenged him, and he was sworn as a juror; thus making the twelfth juror, and completing the panel." The lengthy explanation of the trial court shows appellant is without any just ground for complaint in the organization of the jury. No objectionable juror was forced upon him. In Adams v. State, 35 Texas Criminal Reports, 295, the court said: "The answers of said jurors, in connection with the qualification of the court to the bill of exceptions, shows that those of said jurors that had formed any opinion in the case had done so, not from having heard any witness state the facts, but from rumor and hearsay; and they further declare that, notwithstanding any opinion then entertained as to the guilt or innocence of appellant, they could give appellant a fair and impartial trial on the evidence in the case." See also Suit v. State, 30 Texas Crim. App., 319; Kennedy v. State, 19 Texas Crim. App., 629; Johnson v. State, 21 Texas Crim. App., 368; also Post v. State, 10 Texas Crim. App., 591. It is "the established rule in this State that, although the court may err in holding a juror qualified who is not, yet, if appellant is tendered a fair and impartial jury, he can not complain, although he may have been deprived of a challenge by the improper action of the court." Keaton v. State, 40 Texas Crim. Rep., 139. In Loggins v. State, 12 Texas Criminal Appeals, 73, White, Presiding Judge, delivering the opinion of the court, said: "As stated concisely in Holt's case, 9 Texas Criminal Appeals, 571, it is that, 'unless objection is shown to one or more of the jury who tried the case, the antecedent rulings of the court upon the competency of jurors who have been challenged and stood aside will not be inquired into in this court; but, if one objectionable juror is forced upon defendant after exhausting his peremptory challenges, then he will be entitled to have the action of the court reversed' as to any juror against whom objection was urged which should have been sustained." It will be seen from the foregoing authorities that appellant's contention is not borne out by them, nor by the explanation of the court, since no objectionable juror was forced upon appellant after he had exhausted his peremptory challenges.

Bill of exception number 4 complains that the court erred in permitting the declaration of deceased to be introduced as testimony. On the trial the State introduced James Stanton, who testified that thirty-five or forty minutes after Lee Johnson (deceased) was shot and said Stanton had stopped the train on the way from Coleman Junction to Santa Anna, deceased was groaning, and said he was suffering very much. Stanton had previously testified that, some five minutes after deceased had told witness he was shot, witness laid down by the side of deceased for some ten or fifteen minutes, during which time deceased told witness he was shot through the bowels, and also said he did not know whether he could get in the cab of the engine, but expressed the

opinion he could do so with the witness' assistance. Deceased got into the cab and rode about three-fourths of a mile. He had also testified that, after arriving at Santa Anna and putting deceased in the depot, and when witness left the depot, about an hour after deceased was shot, deceased was groaning, and seemed to be in a great deal of pain. To each of these facts appellant objected, for the reason that the same was hearsay, not a part of the res gestae, immaterial, and prejudicial to appellant; and the court overruled the objection and permitted said testimony. The court qualifies the bill as follows: "Stanton testified that, after difficulty ended, he ran train to Santa Anna; that he was about eight minutes in getting train to Santa Anna; that fireman Lee Johnson was taken out of cab, put in depot, and remained there in depot twenty or thirty minutes, and was carried then to hotel; that from time of leaving scene of difficulty until the fireman got to hotel was about thirty or forty minutes; that he [Stanton] did not remain at hotel but a few minutes, and did not go into room, but remained on gallery, where he could see in room and hear what was going on. He testified to condition of fireman during this time, and suffering, and the complaints as mentioned in the bill." We do not think the court erred in admitting this testimony. It was perfectly competent for the court to permit the State to prove the mental or physical condition, or both, of deceased immediately after he was shot.

In bill number 5 complaint is made of the following action on the part of the court: "The State, for the purpose of showing consciousness of approaching death on the part of Lee Johnson, had proved the character of the wound inflicted, the suffering experienced by said Johnson from the time of its infliction, and (by a physician) that the wound was necessarily fatal, and a painful wound, and that deceased continued to sink gradually from the time the physician first saw him, on the night of the shooting, until his death, with the exception of a short while just after the operation, and at that time the physician stated he seemed to rally a little, but only for a short while, probably an hour, after which time deceased gradually and perceptibly grew worse, until he died that night, a few minutes before 10 o'clock on June 10, 1898; that the operation was performed upon deceased about 9 or 10 o'clock in the morning of said 10th of June; that about 8 or 9 o'clock Mrs. B. H. Melton went into the room where Johnson was, and went up to him, and with her apron wiped the cold sweat off his face, and Johnson, seeing parties bringing in a stretcher into another room, asked Mrs. Melton what they were going to do with him [Johnson]; that Mrs. Melton said to him, 'They are going to perform an operation on you, and I hope you will soon be better.' Johnson replied, 'No, I'll never be any better; I am a done man.' The State further proved he was rational up to within a few minutes before he died. Thereupon the State proved by Joe Gardner and Ben Melton that between 6 and 7 o'clock p. m., June 10th, Gardner was in the room with deceased (he having taken Johnson's place on the engine the night preceding), and, after some conversation about how the engine worked,

Gardner asked Johnson how he felt, and Johnson said he wasn't any better, and Gardner asked him who shot him, and he said: 'I don't know who the man was. Buchanan never shot me. It was a man at the trucks, near the pilot that shot me.' Witnesses stated the conversation took place about three hours before Johnson died." Appellant objected to the testimony on the ground that it was not shown deceased was conscious of approaching death and believed there was no hope of recovery at the time of the making of the declarations and statement. We think the above statement contradicts appellant's contention, and shows deceased was in contemplation of approaching death at the time the statement was made. There is no form of phraseology in which a party making a dying declaration must indicate the fact that he is conscious of approaching death. So this is done with reasonable clearness, it is sufficient. We said in Miller v. State, 27 Texas Criminal Appeals, 80: "It is enough if it satisfactorily appears in any manner that they [referring to dying declarations] were made under that sanction, whether it be directly proved by the express language of the declarant or be inferred from his evident danger or the opinions of medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind." See also Sims v. State, 36 Texas Crim. Rep., 154. Applying the foregoing rule of law to the facts as detailed, we think the evidence clearly shows deceased, at the time he made the statement which was introduced in evidence against appellant, was conscious of approaching death, and that the circumstances and environments were such as clearly indicated deceased understood he must die.

In bill number 6 appellant complains that the court permitted the State's attorney to ask appellant on cross-examination the following questions: "How long have you been out of the penitentiary? How long were you confined in the penitentiary? Have you ever been charged with any other felonies besides the one you were in the penitentiary for?" Appellant objected to all of said questions: "(1) Because the questions assumed as a fact that defendant had been in the penitentiary, of which fact no evidence had been offered. (2) Because it was immaterial how long defendant had been out of the penitentiary, or that he had ever been in the penitentiary, except to show that defendant had been convicted of a felony. (3) That, if the object sought be to show defendant had been convicted of a felony, the record of such conviction was the best evidence of such fact." All of said objections were overruled, and appellant testified that he had been out of the penitentiary for about two years, was confined there about twenty-one months, and that he had been frequently indicted for felonies. In Darbyshire v. State, 36 Texas Criminal Reports, 547, we said: "While defendant was on the stand testifying in his own behalf, State's counsel on cross-examination proved by him that he had served a term in the penitentiary. This was objected to for several reasons. We deem it unnecessary to notice the objections, for under

the repeated decisions of this State, this character of testimony was admissible for the purpose of impeaching his testimony." The fact of defendant having been charged with other offenses is also admissible as affecting his credibility. This is well settled in this State. Clark v. State, 38 Texas Crim. Rep., 30; Rutherford v. State (Texas Crim. App.), 34 S. W. Rep., 271; Carroll v. State, 32 Texas Crim. Rep., 431. And it is not necessary that the record of conviction should be introduced in order to prove the facts, but he may be forced to answer the same as indicated in the above decisions. We note, however, that the court in its charge limited the effect of this testimony to the purpose of impeachment.

Bill number 6 also complains that the court erred in refusing to give special charge requested "to find defendant not guilty of the offense charged in this case, in view of the fact that he had previously been convicted of an assault with intent to rob, and that the offense of which defendant is now on trial was the same offense for which he had been convicted in said trial of assault to rob." An inspection of the evidence shows that the court did not err in refusing to give the special charge. They are not one and the same act, nor one and the same transaction. One was an assault with intent to rob Robert L. White, and the charge in this case is the murder of Lee Johnson. The true criterion in pleas of this character is, if the act for which defendant is being prosecuted is the same violence or act relied upon in the case wherein he was previously convicted, or if the two offenses constituted but one continuous transaction, in which appellant was the actor, this prosecution could not stand; but if the acts were distinct and separate transactions, and the prosecution is maintained to conviction against defendant in one, this fact can not be pleaded in bar of a subsequent prosecution for a different offense by sheer force of the fact that the last offense occurred at one and the same time. Taylor v. State, ante, p. 564; also Herera v. State, 35 Texas Crim. Rep., 607; Sadberry v. State, 39 Texas Crim. Rep., 466.

Appellant urges various objections to the court's charge. In the view we take of the same, it is necessary to consider but one. The court, among other things, charged the jury as follows: "Unless you further believe from the evidence, beyond a reasonable doubt, that defendant Pearce Keaton entered into a conspiracy with Bud Newman, Jeff Taylor, and Bill Taylor, or either of them, to commit the offense of robbery,—that is, to rob the express company on the Gulf, Colorado & Santa Fe Railway Company's road at Coleman Junction,—and agreed among themselves as to the part each was to perform in the said enterprise of robbery, and that in pursuance of said agreement and conspiracy defendant, with the said parties named, or either one of them, did go to Coleman Junction, and that said Coleman Junction was and is in Coleman County, Texas, and did then and there, in pursuance of said conspiracy, attempt to commit and perpetrate the crime of robbery, and for the purpose of accomplishing said robbery, and for the purpose of aiding and assisting in its perpetration, the defend-

ant either alone or acting together with said Newman and Jeff and Bill Taylor, or either one of them, with force and arms, and against the consent of Lee Johnson, and upon express malice, willfully compelled the said Lee Johnson to leave a place of safety, if any, and with force and arms knowingly compelled said Lee Johnson to go against his will to a place where, in case of resistance to the commission and perpetration of said offense of robbery, it was reasonably apparent to defendant and those acting with him that said Lee Johnson would naturally and necessarily be exposed to death, and likely lose his life; and you further believe that, knowing these natural, probable, and necessary consequences, if any, defendant or any other person, if any, acting with him, so compelled said Lee Johnson to be in such position, and that the placing of said Lee Johnson in such position, if any, was in pursuance of said conspiracy to rob, if any, and in furtherance and aid thereof, and that while in said position R. E. Buchanan, in resistance to the perpetration of said attempted robbery, if any, did innocently shoot and kill said Lee Johnson, on or about the 9th day of June, 1898, in Coleman County, Texas, not intending to do so, but actually intending to kill the parties attempting to perpetrate said robbery, if any, and that said killing was caused and directly brought about by the acts of defendant, or those acting with him, if any, in so compelling said Lee Johnson to be and remain in said position,—then you are instructed that defendant would be guilty of murder in the first degree, and you will so find in your verdict, and assess the punishment as hereinbefore instructed. If you do not so believe, you will acquit." We think the above-copied charge very clearly presents the law applicable to the facts. Article 77, Penal Code, provides: "If any one, by employing a child or other person who can not be punished to commit an offense, or by any means such as laying poison where it may be taken, and with intent that it shall be taken, or by preparing any other means by which a person may injure himself, and with intent that such person shall thereby be injured or by any other indirect means cause another to receive an injury to his person or property, the offender by the use of such indirect means becomes a principal." In Blain v. State, 30 Texas Criminal Appeals, 702, Judge Hurt, delivering the opinion of the court, said: "Again, if a person instigates or agrees with another to commit a crime, and the person so instigated commits a crime different from, but one likely to be caused by or become the reasonable result of, the crime intended, the instigator is an accessory before the fact, and, if present at its commission, is a principal thereto." Again, in Reddick v. Commonwealth (Kentucky), 33 Southwestern Reporter, 417, the court approved the following charge: "If the jury believe from the evidence, to the exclusion of all reasonable doubt, that accused willfully, maliciously, and feloniously set fire to and burned the Miller Hotel, then being occupied by Mrs. Masters as a residence, and that by reason of that burning she lost her life, then the jury should find accused guilty of murder, although accused may not have intended or calculated the

death of Mrs. Masters as the result of such burning." Commenting upon the charge, the court say: "This instruction, we take it, embraces a great principle of law, and that the same is so uniformly held and acted upon in all criminal prosecutions as to need no special citation of authorities." Now, applying the principle laid down in the foregoing authorities to the question before us, we find that appellant, together with several others, went to the scene of the homicide for the purpose of robbing the train; that they forced deceased to go with them, after stopping the train, down to the door of the express car, having been previously warned by the engineer that some one would probably commence shooting at them from the rear end of the car, where the passenger coaches were. Defendant, in his own statement as quoted above, admits knowledge of this, and that the same was communicated to him prior to the time Johnson was taken to the express car. Then certainly he would be responsible for the reasonable, natural, and probable result of his act, to wit, placing deceased in a place of danger, where he would probably lose his life. Therefore we think the court's charge as above copied was a clear and proper presentation of the law applicable to the facts upon the trial of this case. Taylor v. State, ante, p. 564.

We have carefully reviewed all of appellant's various assignments, and do not think any of them are well taken, but will say, in passing, we do not think the court erred in refusing to charge on circumstantial evidence, as strenuously contended by appellant. There appearing no error in the record, the judgment is affirmed.

*Affirmed.*

HENDERSON, Judge, absent.

DAVIDSON, PRESIDING JUDGE.—The bill of exceptions in regard to the juror Warren shows no reversible error. While I believe the cause for challenge should have been sustained in regard to this juror, yet this was waived by appellant's refusal to exercise his peremptory challenge, which he could have done. When the cause for challenge was overruled, he accepted the juror without having exhausted his peremptory challenges. Thereafter there was no legally objectionable juror placed upon the jury. If appellant was not satisfied with the juror Warren, he should have exercised his peremptory challenge. Not having done so, he is in no position to complain. For authorities, see White's Ann. Code Crim. Proc., sec. 756. Warren was the eleventh juror sworn in, and Griggs, the twelfth juror, is admitted by the bill of exceptions to have been qualified.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]