### HENRY HIERHALZER v. THE STATE.

#### No. 2961.　Decided October 26, 1904.

**1.—Murder—Charge of the Court—Temporary Insanity—Duty to Charge the Law.**

Where the evidence in a murder case raised the issue of temporary insanity, it was the duty of the court to charge on this phase of the case, and this error of the court could be raised in the motion for new trial, although no exception had been made to the court's charge and no special instruction requested.

**2.—Same—Practice—Prerogative of the Jury.**

The duty of the court to give a charge in a felony case on the issues raised by the evidence, is not dependent upon the court's judgment of the strength or weakness of the testimony supporting the theory of the defense, and the case must be looked to from the standpoint of the defendant, however unreasonable it may appear.

**3.—Charge of the Court—Temporary Insanity—Recent Use of Intoxicating Liquor—Degree of Murder—Penalty.**

Where the evidence raises the issue of temporary insanity from the recent use of intoxicating liquor, it becomes the duty of the court, under article 41, Penal Code, to submit this phase of the case to the jury, so as to enable the jury, in case of a reasonable doubt of the defendant's guilt as to the degree of murder, to find him guilty of the second degree, or to affix the lesser penalty for murder in the first degree, if they have no such doubt.

**4.—Same—General Insanity—Charge of Court.**

See opinion for evidence stated therein, which required the court to submit a charge on temporary insanity from the recent use of intoxicating liquor, notwithstanding the court charged upon general insanity.

**5.—Misconduct of Jury—Practice—Counter Affidavits.**

Where the defendant sets up misconduct of the jury, and the testimony with reference thereto is not adequately met by the affidavits introduced by the State, a new trial should be granted.

**6.—Jury—Empanelment—Bill of Exceptions—Challenges.**

Before a case will be reversed for improper empanelment of the jury, the bill of exceptions must show that appellant exhausted his challenges and that some objectionable juror sat in the trial of the case.　Following Keaton v. State, 41 Texas Crim. Rep., 621; Taylor v. State, 72 S. W. Rep., 396.

Appeal from the District Court of El Paso.　Tried below before Hon. A. M. Walthall.

Appeal from a conviction of murder in the first degree; penalty, death. .

The following taken from appellant's brief is a substantial copy of appellant's testimony, which taken together with the facts as stated in the opinion will give a full statement of the case:

As the testimony of appellant is the recital of a very peculiar homicide, we will set it out at length: "I have known him (deceased) about two and a half or three years.　I met him first at Charley Burckell's saloon here.　About six months after we became acquainted he came to me one day and asked me to go across the river with him, and I went with him and he introduced me to Louis Heinze; we all three

went around town taking in the sights for a few hours and came back on this side again. I told him I had to go back to work and he came over with me to Burckell's where I was working. I talked with him while I was changing my clothes preparatory to going to work, and before I went to work I went back to the toilet. When I came back he was sitting outside in the back yard on a bench. This was about five o'clock in the afternoon, and from that time on our friendship started up, up to the time of his death. While he was sitting on the bench I walked up to him; I saw he had been drinking some; I laid my hand on him; he raised his right hand up and pulled me down and kissed me; that was the first—from that time on—that was the beginning of our close friendship. After that we used to kiss each other. I went to the ball in the Masonic Temple on the night of the 14th of May. I was armed that night. The way it came about, I was working in the Louvre saloon on the night shift, and every evening before I went to work I go to my room and get my gun and take it along with me to the saloon, then put it on on the way going home, because I have all the way from the Louvre up here to go along about two or three o'clock in the night. I was, however, only working extra then. On this day, Saturday night, the proprietor of the Louvre was there; he said he was going to do his own work; he paid me off, and naturally I put my gun where I usually would carry it, and went up to Charley Burckell's and stood in around the bar there and took a few glasses of beer with Charley. Then Louis Heinze came in while I was there. He and I took a glass of beer. He says, Aint you going up to the ball?' I says, 'That is so, there is a ball to-night, I came pretty near forgetting all about that.' Without thinking at all I had this gun on me, I turned and went right up to the ball with Louis Heinze, without knowing that I had this gun on me. When I got up there I hung up my hat, went inside of the ball room, and at the further end I saw some ladies and gentlemen sitting down there drinking whom I knew, and I went over and sat down there with them. While we were sitting there I happened to look around toward the door and I saw Johnie. I got up and walked to him, asked him to come over to the other end of the hall and take a drink with us. He said wait, I came back; he had his cap on; I says all right and went back and sat down at the table; then in a minute the music for the grand march was played. We all took part in the grand march; by the time that was over Johnie was back; then, of course, we all separated and commenced dancing. I danced with Mrs. Wunderwaldt that night. I did not know with whom Johnie came. I heard Mrs. Wunderwaldt testify. Her testimony was in a way correct. I mean this, that Johnie had gone a little too far—little too far on good friendship; he would have to apologize or he and I would quit right then and there. I danced a part of the last dance with Mrs. Wunderwaldt; then Johnie took Mrs. Wunderwaldt and finished the last dance with her. When the ball broke up I took my hat and went out in the hall, stood there and observed Mrs. Wunderwaldt and the deceased pass by. I can not

recollect whether I was talking to a woman or some children or not. As I was standing there Mrs. Wunderwaldt came up, ran her arm through Johnie's arm and rushed him off down stairs. It looked as though she was trying her best to get him away from me as soon as possible. When I saw them it looked to me as though she was trying to get the last friend I had on earth away from me. Somehow or other my mind seems to have left me; I can not recollect now; my brain began to whirl around some way or another. I could not account for anything else from that time on. Seems everything went by; I can not recollect anything. I first think I remember next morning at half past seven; I happened to look at my clock in my room; I got up and dressed and started up town. I got outside of the gate and Mrs. Runkamp called me back (she is the lady I roomed with) ; she said, 'Have you heard anything about Johnie Hoerr getting shot last night?' I says, 'Anything happen to him?' She says, 'Somebody supposed to have shot him.' That is the first I knew of his being shot. Afterward, I walked up to Charley Burckell's, walked in and got a glass of beer. That is about two blocks from the Masonic Temple building where the Sons of Herman dance was on May 14th, 1904. The bartender, named Charley Ross, gave me a glass of beer and while I was drinking I says, 'I heard my friend Johnie got shot last night.' The bartender says, 'Yes.' I finished my glass of beer, walked out of the saloon. While I was out there another man who had been working for Charley Burckell followed me out and says, 'How come you to get into this difficulty?' I says, 'The hell,' I says, 'I would like to know what I have got to do with it.' I went out and called for a morning paper, took the paper, set out on the back porch and read it. I was arrested about 8 o'clock by Manning Clements. I had no recollection at all of making any assault on Johnie Hoerr that night. The first intimation that I had that I was implicated in any manner in it was at Charley Burckell's saloon next morning. I had no ill feeling toward him. I never had any ill feeling toward him. I had no intention to kill Johnie. At the time of his death we were as good friends then as at any time. I would not hardly know how to define our friendship. We were intimate friends. Our friendship even went so far as to let me read his love letters. We hardly ever parted for the night but what we shook hands and kissed for the night. He was rooming at that time over Krakauer's store. He would come down to the place and stay until two or three o'clock, when I would close up and take a glass of beer, and then I used to go with him down to the store, and would kiss him good-night, he'd go to his room, I go to my room. There was never any immoral impulse of any character of friendship between myself and Johnie. I had no ill feeling toward Mrs. Wunderwaldt. Was not attached to her in any way at all. I have suffered unconsciousness before. I was between 12 and 13 years old, back in Ohio on a farm. We always had some 10 or 12 head of horses and some colts. Most always we had old horses that we used to break in the colts with. One day we was to break in a colt; my

brother went to work and harnessed the colt first, then we began to harness the old horse; he told me to watch this colt to see that it would not get tangled up in the harness; that is all I know about that, now I will have to tell you what I was told when I became conscious, four days afterward. I was also unconscious from another cause several hours at one time, having fallen on the ice, cut a big gash in my head here. About when I was 17 years old I was in Indianapolis; I was going to learn a trade in a planing mill; I was taken down with typhoid fever. It took me six months before I was able to go back to work. I was unconscious several times during my illness. I suffer from neuralgia now right in the back of my head when I catch a little cold. I am not a very hearty eater. I very seldom eat more than one meal a day, sometimes I do not eat for four or five days because it does not agree with me. I don't feel like it, I have no desire for it. I don't mind it. I have drank excessively for the last 20 or 22 years. Cause of that mostly from loss of wife and child. My child died first. When I left home I went to Los Angeles; then through the treachery of a friend of mine, I come to get a divorce from my wife. I thought it was a friend of mine; finally found it he was my worst enemy; through his influence, from letters she wrote, I refused to have anything to do with my wife. I told her to apply for a divorce, which she did. When I found out I had been tricked, that began to work on my mind; from that time I began to drink. When I was in Los Angeles I received a letter one day that my child was dead and buried, and my wife was then making preparations to come to Los Angeles. Then I got those letters from him whom I supposed to be a friend, cautioning me about my wife running around with other men. Naturally I began to investigate, then when she wrote me again I would not have anything to do with her."

Cross-examined: "I had known the deceased intimately about two years and a half. During that time I roomed at various places; worked at Beissmenger's, worked at the Louvre and the Ranch; been tending bar. I drank considerably during that time. I had an invitation to the ball. I had two or three conversations with the deceased that evening. I had no words with him. I remember dancing with Mrs. Wunderwaldt. I meant by that statement I made to Mrs. Wunderwaldt that Johnie had gone a little too far in the way of friendship, overstepping friendship. I told him several times I did not want him to have anything to do with Anderson. I had seen deceased several times during that month. I did not demand any apology of him. I don't know why it occurred to me during the ball to demand an apology. I had no feeling against him whatever. I don't remember anything about which Mr. Solke testified. It is something new to me. I had been drinking prior to that time. I remember the conversation in the Ranch saloon on April 15th, 1904, that Mrs. Wunderwaldt testified about. I did not present any pistol to the deceased. I did not want him to talk to me about Anderson. I said, Johnie, cut Anderson out; I don't want to hear anything about Anderson, I have no use for him. I says, He is

a friend of yours. I says, I don't want his friendship. I drew a pistol merely to indicate I did not want anything to do with him. I did not state in that conversation that he or Anderson, one or the other, would have to be killed. I did not say anything about shooting or killing. I did not intend to use it on him. I told him he either had to cut Anderson out or cut me out. I never spoke to Anderson about it. I guess I danced pretty near every dance that evening. I danced two or three with Mrs. Wunderwaldt. She is mistaken about me dancing the next to the last dance with her. I had no feeling when she left me and danced with Johnie. I let her go myself. I had this same feeling when I saw him dancing with others that night. I did not like to see him with any one else. I had that same feeling every time I saw him with any one else. The first time I knew that deceased was escorting Mrs. Wunderwaldt was when I saw her grab him by the arm that night. I don't remember any ladies and children standing there. I never said anything to John Hoerr at that time. I saw Charley Burckell inside the ball room but don't recollect seeing Solke. I have been indicted once before for shooting people in El Paso County. I never drew a pistol on anybody else with intention to shoot."

Re-direct: "The name of the man I shot at was Bob Black. * * * I was fined $25 for carrying concealed weapons. I had a sort of jealous feeling when I saw John Hoerr talking to anybody else. I don't know what occurred from the time I started down the steps until next morning when I got out of bed at about 7 o'clock."

*Johnson & Edwards,* for appellant. The statute of this State requires that in all trials for murder where the evidence tends to show that the killing was the result of temporary insanity produced by the immoderate use of intoxicating liquors, the judge shall charge the jury that they may consider such temporary insanity in mitigation of punishment as well as in determining the degree of murder. The evidence in the present case raised this issue and required that the jury be so instructed; and the failure of the court so to do was error for which the judgment must be reversed. Art. 41 White's P. C.; Otto v. State, 80 S. W. Rep. 525.

After the charge of the court had been delivered to the jury and they had retired, when neither appellant nor his counsel was present, the jury received other testimony in addition to that which had been properly adduced upon the trial; some of the jurors vouchsafed to the others a statement that appellant was addicted to an unutterably degraded, vile and loathsome practice with men, of which there was no other evidence, and reviled him with the coarsest and vilest abuse. This misconduct occurred after the jury had retired to consider of their verdict and before the death penalty had been agreed upon. It was peculiarly prejudicial to appellant, especially in view of the testimony which tended to show that there was a relation of intimacy and affection between him and the

deceased and that he experienced a feeling of jealousy when he saw deceased talking with any other person. This additional testimony amounted to more than mere vituperation and abuse of appellant by his triers; it was the distinct statement of a pretended fact, the injurious effect of which is manifest.

The motion for new trial sets up this additional and prejudicial testimony, made to the jurors after their retirement, and this ground of the motion is fully sustained by the affidavits of Jurors Harris and Delaney, to which attention is invited. Their affidavits are not disputed at all except by the affidavit of Juror Holgate, that he heard no juror make the statements referred to, and the affidavit of Juror Gaughan, that "he does not now remember hearing" such statements.

No one can doubt from an examination of the record that this additional testimony was received by the jury after their retirement and before the verdict had been agreed upon, or that the same was effective in accomplishing the injury to appellant which was intended by it.

The action of the court in disregarding and overruling this ground of the motion for new trial was error which requires that the judgment be reversed.

Suppose the prosecutor in his closing argument had told the jury that the defendant on trial for his life was a C—k S—r and a S— of a B—. This might have been attributed to excessive zeal and somewhat discredited in the absence of evidence. But, surely, such conduct would have operated to reverse this judgment. Can it be that when this horrible statement is made to the jury in the privacy of their retirement by a prosecutor who is one of their own members, and when the jury subsequently visits the death penalty upon the victim of these aspersions, the accused has no redress in this court: This matter is properly before this court, having been distinctly set up in the motion for new trial and fully sustained by affidavits of jurors, and the action of the court in overruling the motion having been properly excepted to. If the two jurors who make the supporting affidavits were swearing falsely, it is certain that the State could have found jurors among the remaining ten who would have come nearer contradicting them than have the jurors, Holgate and Gaughan, who merely say, one, that he did not hear the statements referred to, and the other, that he "does not now remember hearing" them. Dixon's case, 79 S. W. Rep., 310; Sims' case, 70 S. W. Rep., 90; Mason's case, 16 S. W. Rep., 766; Mitchell's case, 36 S. W. Rep., 456; Tate's case, 42 S. W. Rep., 595; Holmes' case, 42 S. W. Rep., 996; Darter's case, 44 S. W. Rep., 850; Ysaguirre's case, 58 S. W. Rep., 1005; Lankster's case, 65 S. W. Rep., 373; art. 817, C. C. P., Sub. 7 and 8.

A ground of exception in the motion for new trial is: "Because the court failed to charge the jury as to the law applicable to all the material phases of the case arising from the evidence."

In a capital case in which the death penalty has been assessed this exception in the motion for new trial is probably sufficient to authorize

this court to consider this most hurtful error of the trial judge, and we submit that by reason of it the judgment should be reversed.

*Waldo Burns* and *Sam B. Gillett,* also for appellant.

*Howard Martin,* Assistant Attorney-General, and *George B. Estes,* for the State. The trial court did not err in not giving in charge to the jury Article 41 of the Penal Code, as the evidence in the case did not warrant the same. White's Criminal Code, Art. 41, and authorities there cited; Vallereal v. State, 20 S. W. Rep., 557; Clore v. State, 26 Texas Crim. App., 630; Ex Parte Evers, 29 Texas Crim. App., 539.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal. The evidence for the State tends to show that although appellant and deceased had been on friendly terms, that a short time before the homicide appellant became jealous that others would interfere between their friendly relations, and on that account appellant made some remarks against deceased, which might be construed into threats. That on the very night of the homicide, which occurred during a German ball or dance, he remarked to Mrs. Wunderwaldt whom deceased had accompanied to the dance, that Hoerr (deceased) must not talk to him about one Anderson, he was his worst enemy; that he would have to beg his pardon that night, or—without completing the sentence. He is also shown, to have told one Solke, who was standing in the corridor near the door of the ball-room, "That John Hoerr is a two-faced son of a bitch; I will get even with him." This last remark was uttered but a short time before deceased was killed by appellant. It appears, as stated, that appellant and deceased were on exceedingly friendly relations, and the motive assigned by the State is that appellant appeared to be jealous of any one who would interfere with their friendship. On the night in question both appellant and deceased attended a German ball. Both participated; and it seems both danced several sets with Mrs. Wunderwaldt, whom deceased accompanied to the ball. Sometime about 1 or 2 o'clock the ball broke up, and appellant was standing on the stairway, which afforded a means of exit from the dance room. Deceased was also standing near. Mrs. Wunderwaldt came out of the ball-room, took deceased by the arm, and hurriedly went downstairs. Appellant followed, and shortly after they had gotten downstairs and were walking along the pavement, appellant came up behind and shot deceased in the back of the head, exclaiming, in the German language, "There; you got it." Appellant relied on insanity and temporary insanity caused by the recent use of intoxicating liquor. He introduced evidence tending to show a warm state of friendship existing between him and deceased. That they were very fond of each other, and that they were continually in one another's company. His own evidence tended

to show he had received injuries in early life which affected his mind; and that this was intensified by domestic troubles and by the use of intoxicating liquors. It was further shown by him that he saw deceased come down the stairway with Mrs. Wunderwaldt, and he thought he was losing his last friend, and after that he did not know what occurred; that the next morning when he was informed he was implicated in killing deceased, he did not remember it. This is a sufficient statement of the case to discuss the questions raised by appellant.

Appellant assigns as error the action of the court in failing and refusing to charge the jury, the statute with reference to temporary insanity, produced by the recent use of intoxicating liquor. No charge was requested on this subject at the time of the trial, and no bill of exceptions were then taken to the refusal of the court to give such a charge. However, appellant raises this question in motion for new trial. If the evidence raised this issue, unquestionably, a charge should have been given presenting this question. The law is, that the court is bound to embrace every phase of the case presented by the evidence; and the rule is, if there is any evidence tending to establish a defense, defendant is entitled to a charge directly upon the point, no matter what may be the view of the court on the weight or the value of the testimony. The duty is not dependent upon the court's judgment of the strength or weakness of the testimony supporting the theory—it being the prerogative of the jury to pass upon the probative force of the testimony. The case must be looked to from the standpoint of the defendant, and if his testimony presents any defensive theory, however unreasonable it may appear, it is the duty of the court to give it in charge to the jury. See authorities cited in White's Ann. P. C. sec. 801, subs. 2 and 3. The court gave in charge to the jury the doctrine of insanity generally, and authorized the jury, if they believed defendant was insane at the time of the commission of the act to such a degree as to incapacitate him from a knowledge of the right and wrong of the particular act at the time, to find him not guilty. But nowhere did the court charge on temporary insanity from the recent use of intoxicating liquor, as provided in article 41 Penal Code. This particular article authorizes proof of such insanity; if the jury shall believe it exists in case of murder, it enables them to determine the degree of which defendant may be found guilty, or it may be established to enable them to affix the penalty. That is, as we understand it, it would be the duty of the jury, where temporary insanity of this character is shown, in case they have a reasonable doubt as to the degree of murder to find defendant guilty of the second degree; or if they had no such doubt and find him guilty of murder in the first degree, to affix the lesser penalty. Evidently, the court believed there was evidence in the case presenting the defense of insanity, otherwise the charge on that subject would not have been given. To our mind, if the court was required to instruct the jury as to the doctrine of insanity at all, and we believe the evidence justified this, there was certainly evidence in the case suggesting that this in-

sanity was produced by the recent use of intoxicating liquors. As far as we are advised from the record, appellant's mind had been abused and weakened from dissipation; and this condition was enhanced by the recent use of intoxicating liquor. Early on the night in question, his employer had discharged him because of his boisterous conduct in the saloon, breaking up glasses, etc., and at that time he pronounced him drunk or crazy. There is also testimony in the record tending to show that before appellant went to the ball, after he left the saloon from which he had been discharged, he went to Charley Burckell's, and there took several glasses of beer with him; and Lewis Henzy came in and he took a glass of beer with him. Afterwards he went up to the ball. Early during the dance, an hour and a half or two hours before the homicide, Mrs. Wunderwaldt states that he was then too drunk to dance, though she says he was sober enough during the last hour or two of the ball to dance. Another witness testified that a short time before the homicide he was standing in the ante-room where the ball was going on, and appellant, "All of a sudden threw a glass of beer right into the ante-room: the glass, beer and all, rolling into the room." Witness asked him "what was up now," to which defendant replied, "That is the way it is: you may think you have got a friend, then you haven't got any." And in that connection used the remarks about deceased as before stated. This is substantially the evidence, which indicates that appellant was drinking that night. It shows, not only, that appellant was drinking, but, in the opinion of at least two witnesses, that he was drunk in the early part of the night, down to within an hour or two of the homicide. We take it, that no one will seriously contend, that even if he were drunk two hours before the act of shooting, that this would not be such recent use of intoxicating liquors as would require the court to give in charge the statute in question, provided it appeared that at the very time of the homicide appellant was not then of sane mind. As stated, the court instructed the jury as to insanity, evidently believing there was evidence tending to show this at the time of the commission of the homicide. But, on what hypothesis the court was enabled to find that insanity was in the case and not attributable at all to the recent use of intoxicating liquor, we are not able to determine. No doubt, the learned judge believed, from the fact that the evidence showed that appellant and deceased up to the time of the homicide were warm personal friends—greatly attached to each other; and the fact of a sudden killing by appellant of deceased, in the absence of any motive which usually characterizes a homicide, as well as the evidence tending to show appellant's condition of mind, required him to submit to the jury a charge of insanity. And in this we think the court was right. Under the evidence in this case showing the use of intoxicating liquor by appellant on that night, we believe the court was equally if not with stronger reason bound to submit to the jury a charge covering our statute on the recent use of intoxicating liquor.

We are also inclined to the opinion, that a new trial should have been

granted because of the misconduct of the jury while in the jury-room. We do not understand the testimony offered by defendant on this subject to be adequately met by the affidavits introduced by the State. We do not deem it necessary to discuss the questions raised in the empanelment of the jury, as they are such as are not likely to occur again. We believe the principles of law to be well settled by the decisions on that subject; before a case will be reversed on this ground, the bill of exceptions must show that appellant exhausted his challenges, and that some objectionable juror sat in the trial of the case. Keaton v. State, 41 Texas Crim. Rep., 621; Taylor v. State, 72 S. W. Rep., 396.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Davidson, Presiding Judge, absent.

[Motion for rehearing overruled without written opinion.—Reporter.]